**ROCKET JEWELRY BOX, INC., Plaintiff,**

v.

**NOBLE GIFT PACKAGING, INC. and Ralph Herzog, Defendants.**

**No. 95 CIV. 7900(MBM).**

United States District Court, S.D. New York.

Nov. 20, 1997.

Lewis H. Eslinger, Garden City, NY, for Plaintiff.

Michael D. Lesh, New York, NY, for Defendants.

## OPINION & ORDER

MUKASEY, District Judge.

Rocket Jewelry Box, Inc. ("Rocket") petitions to confirm an arbitration award against Noble Gift Packaging, Inc. ("Noble"). Noble opposes confirmation and cross-petitions to vacate the award on the grounds that the arbitrators: (1) rendered a decision that was not final; (2) exceeded the scope of their powers; and (3) manifestly disregarded the law. For the reasons stated below, Rocket's petition to confirm is granted, and Noble's cross-petition to vacate is denied.

## I.

This arbitration is the product of intermittent litigation between Rocket and Noble over the sale of jewelry boxes. In 1992, Rocket filed the first of three patent infringement actions against Noble and its owner, Ralph Herzog, alleging that Noble had made unauthorized sales of two types of jewelry boxes for which Rocket held patents. (Lesh Aff. ¶ 7) Judge Haight dismissed that action for improper venue, concluding that the record did not show that Noble had sold any patented boxes in the Southern District of New York. *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 869 F.Supp. 152, 156 (S.D.N.Y.1994). The dismissal was without prejudice. *Id.* at 157.

### A. The License Agreement and Its Termination

A second patent infringement action, filed by Rocket two years later, ended on a more conciliatory note. Prior to judicial intervention, the parties entered into a "License Agreement" dated March 24, 1995. Pursuant to this agreement, Rocket granted Noble a non-exclusive license to sell its patented jewelry boxes to low volume retail stores. (Def. Mem. Ex. 5, Art. II) In exchange, Noble agreed to: (1) pay Rocket $22,500 in satisfaction of any unauthorized sales it had made prior to December 31, 1993; (2) pay Rocket a 5% royalty on any patented jewelry boxes sold after January 1, 1994; (3) furnish quarterly royalty reports to Rocket, beginning with a report covering the period from January 1, 1994, through the end of the quarter in which the License Agreement was entered into; and (4) permit Rocket to audit its books upon written notice. (*Id.* Arts. IV–V) The License Agreement provided that Rocket could terminate the agreement if, among other things, Noble failed to submit a quarterly royalty report and failed to correct this error within 30 days after receiving a default notice. (*Id.* Art. VI) Finally, the License Agreement contained an arbitration clause providing that "[a]ny disputes arising under this Agreement shall be submitted to arbitration by three (3) Arbitrators under and according to the rules and regulations of the American Arbitration Association." (*Id.*

Art. VIII, § 7) The arbitration clause stated further that "ROCKET and NOBLE shall each pay for their own costs of the arbitration." (*Id.*)

Because the License Agreement served to settle Rocket's claims against Noble, the parties stipulated to a May 17, 1995, order dismissing the second patent infringement action with prejudice. (Def. Mem. Ex. 6) However, even as the parties were agreeing to this dismissal, they were taking steps that eventually would lead to more litigation. Thus, on May 12, 1995, Rocket sent Noble a default notice indicating that Rocket had not yet received the first royalty report, which was to have covered the period from January 1, 1994, through March 30, 1995. (Def. Mem. Ex. 7) Noble's attorney, Michael Lesh, then telephoned Rocket's attorney, Lewis Eslinger, to discuss the default notice. (Tr. at 102)[1] During this conversation, Lesh claims that Eslinger told him "not to worry" about the default notice. (*Id.* at 104) Nevertheless, three days after this conversation, Eslinger sent a memorandum to Lesh repeating the request for a royalty report. (Def. Mem. Ex. 18)

Noble did not send a royalty report until June 28, 1995, more than 30 days after Rocket's May 12, 1995, default notice. (*Id.* Ex. 8) Accordingly, on September 15, 1995, Rocket sent Noble a letter ("termination letter") purporting to terminate the License Agreement effective retroactively to June 13, 1995. (*Id.* Ex. 19) In that letter, Rocket also demanded an opportunity to audit Noble's books. (*Id.*)

On the same day that it sent the termination letter, Rocket filed the present patent infringement action against Noble—its third such suit. In the complaint, Rocket alleges that Noble has continued to make and sell the patented jewelry boxes without authori-

zation since June 13, 1995, the effective date of termination of the License Agreement. (Def. Mem. Ex. 1, ¶¶ 14–29) Rocket seeks, *inter alia*, a declaration that its patents are valid and infringed, an injunction, and an accounting of Noble's profits since June 13, 1995. (*Id.* Relief Section, ¶¶ 1–5) In its answer, Noble raises several affirmative defenses, including a claim that Rocket's design patents are invalid. (Def. Mem. Ex. 2, ¶¶ 18–26)

## B. *The Arbitration*

During the pendency of this third patent infringement suit, Rocket exercised its right under the License Agreement to demand arbitration before the American Arbitration Association (AAA). (Def. Mem. Ex. 9) In its demand, Rocket stated that it sought to recover any royalties to which it was entitled while the License Agreement was in effect. (*Id.*) In an order dated November 29, 1995, I removed the patent infringement suit from the active docket pending resolution of the arbitration.[2] (11/29/95 Order)

The arbitration panel assigned to this case invited the parties to submit memoranda of law regarding the scope of the arbitration. (Lesh Aff. ¶ 28) In its memorandum, Rocket argued that the arbitration should be limited to Noble's violation of the reporting and audit requirements of the License Agreement. (*Id.* ¶ 29) Noble, on the other hand, sought to litigate affirmative defenses, in particular, the alleged invalidity of Rocket's design patents. (*Id.* ¶ 31) The panel determined that the scope of the arbitration would encompass those affirmative defenses asserted by Noble which, if proved, would defeat Rocket's claim to an audit and royalties.[3] (Def. Mem. Ex. 11) The arbitration panel then asked the parties to brief the issue of whether patent invalidity was a defense to Rocket's claims

---

1. "Tr." refers to the transcript of the arbitration proceedings reproduced at Exhibit 15 of Noble's memorandum of law.

2. After Rocket advised me that the arbitration would not encompass matters at issue in the patent infringement action, I returned that action to the active docket. (October 18, 1996 Order) Subsequently, at a pre-trial conference, I determined that the arbitration would include matters in issue in the patent infringement action and,

therefore, again removed the patent infringement action from the active docket. (Nov. 12, 1996 Order)

3. The panel explicitly stated that another of Noble's affirmative defenses—lack of personal jurisdiction—was outside the scope of the arbitration. (Def. Mem. Ex. 11) Noble does not reassert this defense in the present motions.

under the License Agreement. (Lesh Aff. ¶ 38; *Id.* Ex. 14)

In response to this request, the parties entered into a stipulation of issues for arbitration (hereinafter "stipulation"). The stipulation listed six such issues:

"(i) Whether there was a license agreement in effect between Rocket and Noble.

"(ii) What were the parties' rights and obligations under the License Agreement?

"(iii) Did Noble breach the License Agreement by failing to comply with the audit and reporting requirements thereunder and is Rocket entitled to the relief requested in the demand[?]

"(iv) If Noble breached the License Agreement, was such breach waived by Rocket?

Did Rocket breach the License Agreement?

"(vi) Did Rocket wrongfully terminate the License Agreement?" (*Id.*)

The stipulation "expressly preserved" the issue of the "validity of Rocket's design patent and the effect of the invalidity of such patent on the parties' rights and obligations under the License Agreement.... " (*Id.*)

The arbitration hearing went forward on the stipulated issues in February 1997. At the hearing, the sole witness for Noble was its attorney, Lesh. He testified, among other things, that Rocket's attorney, Eslinger, had waived Noble's reporting failure during their telephone conversation they had following receipt of the default notice. (Tr. at 104) At the close of his testimony, Lesh attempted to call Eslinger to the stand to question him on this issue but the panel refused this request after some deliberation. (*Id.* at 123)

The panel issued their award on March 13, 1997. (*Id.* Ex. 16) They determined that there was a valid license agreement between Rocket and Noble; that Noble had breached that agreement; and that, as a result, Rocket was "entitled to an audit of the books and records of [Noble] in order to determine the recovery of royalties, if any, due under the agreement." (*Id.*) The panel determined also

that Noble alone was responsible for paying their salaries as well as AAA's administrative fees and expenses. (*Id.*)

As noted, Rocket now petitions to confirm the arbitration award;[4] Noble cross-petitions to vacate the award under § 10 of the Federal Arbitration Act (FAA), 9 U.S.C. § 10 (1994).

## II.

■ Although the parties do not question the Court's authority to decide their petitions, I have an obligation to consider the issue of subject matter jurisdiction mea sponte. *See Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 608 n. 6, 98 S.Ct. 2002, 2005 n. 6, 56 L.Ed.2d 570 (1978). It is well-settled that the FAA, upon which the parties' petitions are based, does not by itself create federal jurisdiction. *SeeMoses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983); *Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263, 267 (2d Cir.1996). A district court may not consider a petition either to confirm an arbitration award under § 9 of the FAA, or to vacate an award under § 10, unless there is an "independent basis for jurisdiction." *Drexel Burnham Lambert, Inc. v. Valenzuela Bock*, 696 F.Supp. 957, 960–61 (S.D.N.Y. 1988) (Leval, J.); *see also Kallen v. Dist. 1199, Nat'l Union of Hosp. & Health Care Employees*, 574 F.2d 723, 724–25 (2d Cir. 1978) (analyzing § 9 of FAA); *Harry Hoffman Printing*, Inc. v. *Graphic Communications, Int'l Union, Local 261*, 912 F.2d 608, 611 (2d Cir.1990) (analyzing § 10); *cf. Findlay*, 100 F.3d at 267 (analyzing § 4). Moreover, the existence of a federal question in the arbitration does not create an independent jurisdictional basis for confirming or vacating the award. *See Collins v. Blue Cross Blue Shield of Michigan*, 103 F.3d 35, 38 (6th Cir.1996); *Findlay*, 100 F.3d at 267.

In this case, the parties' respective petitions for confirmation and vacatur do not on their face raise an independent basis for

---

4. Rocket originally filed a proposed order confirming the arbitration award. I have construed that proposed order, in accordance with § 9 of the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (1994), as a petition to confirm the award. (5/27/97 Order)

jurisdiction.[5] The arbitration award arose out of a breach of contract claim, and the parties do not argue that the award implicates a federal issue or statute apart from the FAA. *Cf. Kallen,* 574 F.2d at 726 (district court has jurisdiction to vacate or enforce arbitration under § 301 of Labor Management Relations Act). Nor is the defense of patent validity—even if that question had been submitted to the panel—sufficient to create federal jurisdiction under the FAA. *Findlay,* 100 F.3d at 268. Thus, if nothing but the parties' respective petitions were before me, I would be required to dismiss them for lack of subject matter jurisdiction and leave the parties to pursue them in state court, if at all.

However, there is more before me than these petitions. As noted, the present dispute began when Rocket filed its third patent infringement action against Noble, an action over which this court has original jurisdiction. See 28 U.S.C. § 1338(a) (1994). Although that action was removed from the active docket after Rocket filed a demand for arbitration of its License Agreement claims, the action is still pending before this court.

■ Given the pendency of Rocket's patent infringement action, it is necessary to consider whether supplemental jurisdiction exists to entertain the parties' petitions. A federal court has supplemental jurisdiction to hear and decide claims over which it does not have original jurisdiction, provided that it has original jurisdiction over some issues and that both sets of issues—federal and nonfederal—"form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a)(1) (1994). Issues form part of the same case or controversy when they " 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' " *Carnegie–Mellon Univ. v. Cohill,*

484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (quoting *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *see also Promisel v. First Am. Artificial Flowers, Inc.,* 943 F.2d 251, 254 (2d Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992)).

In this case, Rocket's pending complaint alleges that Noble has been infringing its patents since June 13, 1995, the date on which Rocket terminated the License Agreement. (Def. Mem. Ex. 1 ¶¶ 13, 17, 25) Based on this allegation, key issues in the patent infringement case include: (1) whether a license agreement existed between the parties; (2) whether Noble violated that agreement; and (3) whether Rocket properly terminated the agreement. These same issues were also central to the resolution of the License Agreement dispute and, in fact, were submitted to the arbitration panel. (Def. Mem. Ex. 14) Thus, although the patent infringement action arises out of events that occurred after termination of the License Agreement, many of the dispositive issues in the two disputes are identical. Put another way, the two groups of claims "are so tightly interwoven" that the patent infringement claims cannot be resolved without also considering the claims arising under the License Agreement. *Cam–Ful Indus. v. Fidelity and Deposit Co. of Maryland,* 922 F.2d 156, 160 (2d Cir.1991); *Harris v. Rivera,* 921 F.Supp. 1058, 1062 (S.D.N.Y.1995). For this reason, if Rocket had presented both sets of claims in the same complaint, I would have had supplemental jurisdiction to decide the License Agreement claims.

■ However, Rocket did not present both sets of claims in the complaint. Indeed, the arbitration clause would have prevented Rocket from litigating its breach of License

---

**5.** It appears from the record that diversity of citizenship may exist between Rocket, a New York corporation, and Noble, a New Jersey corp, whose owner, Herzog, is a resident of Canada. (Def. Mem. Ex. 1 ¶¶ 3–5) However, neither party contends that the requirements of the diversity statute, 28 U.S.C. § 1332 (1994), have been satisfied. Moreover, the record does not contain facts from which I could conclude that the matter in controversy in the arbitration award ex-

ceeds $75,000. *Cf. Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 792 n. 6 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981) (courts should look to record to determine if jurisdiction exists when "the jurisdictional issue is one that, unlike ... amount in controversy, is a matter easily determined by documents and one as to which there will usually be an unequivocal answer").

Agreement claims in court. Moreover, the parties are not now asking me to decide the claims arising under the License Agreement; the arbitration panel already has resolved those claims. Instead, the parties respectively seek confirmation and vacatur of the panel's award. The question thus presented is whether I have the power to confirm or vacate an arbitration award under the FAA when the arbitration was between parties who are properly before me in an intimately related action. In other words, is the fact that the court would have had supplemental jurisdiction over the dispute underlying the arbitration sufficient to create an "independent basis of jurisdiction" for confirming or vacating the arbitration award? See *Findlay*, 100 F.3d at 268 (giving examples of "independent basis" such as diversity jurisdiction and claim in admiralty).

I have found only one case treating this issue. In *Baltimore & Ohio Chicago Terminal R.R. Co. v. Wisconsin Central, Ltd.,* No. 93–3519, 1997 WL 51460 (N.D.Ill. Feb. 3, 1997), the district considered the issue of whether it had jurisdiction under the FAA to consider the parties' respective motions for confirmation and vacatur of an arbitration award, where the parties were not diverse and where their FAA petitions did not raise a federal question. Id. at *3–4. The court concluded that it had such jurisdiction because "other viable pending claims" arising out of the same case or controversy—specifically, the defendant's federal counterclaims—gave it supplemental jurisdiction to consider the parties' FAA petitions. *Id.* at *4, 9. Understandably, the Court reached this conclusion without citing any authority.

Despite the lack of supporting authority, I am persuaded that the holding in *Wisconsin Central* is correct. In particular, I am persuaded that the holding is consistent with the purposes behind supplemental jurisdiction, on the one hand, and the requirement of "an independent basis of jurisdiction," on the other.

The Supreme Court in *United Mine Workers v. Gibbs*, recognized "that considerations of judicial economy and procedural convenience justif[y] the recognition of power in the federal courts to decide certain state-law

claims involved in cases raising federal questions." *Carnegie–Mellon*, 484 U.S. at 348–49, 108 S.Ct. at 617–18. In the typical case, these considerations arise because the parties present related federal and non-federal claims for litigation before the district court. However, these considerations are no less important in cases such as the present one, where litigants seek confirmation or vacatur of an arbitration award whose facts and issues are interwoven with their pending federal claims. To send parties who are properly before a district court instead to state court in order to confirm an arbitration award that arises out of facts substantially similar to those underlying their federal dispute would disserve the interests "judicial economy, convenience and fairness to litigants" that *Gibbs* sought to protect. 383 U.S. at 726, 86 S.Ct. at 1138.

Exercising supplemental jurisdiction over FAA petitions is also consistent with one of the main purposes behind the "independent basis of jurisdiction" requirement. This requirement is not in the text of § 9 or § 10 of the FAA, the sections that authorize a federal court to confirm or vacate an arbitration award, respectively. Rather, the requirement has been judicially inferred, based in part on limiting language in other sections of the FAA, *see Kallen*, 574 F.2d at 726 n. 6, and in part on the recognition that, without such limitation, the FAA could be read to bestow federal jurisdiction to confirm or vacate *any* arbitration dispute affecting interstate commerce. See *Hoffman Printing*, 912 F.2d at 611 n. 1. Courts have resisted such a result on the grounds that "[i]t would be surprising" if Congress intended such a drastic expansion of federal jurisdiction. *Valenzuela Bock*, 696 F.Supp. at 961; *accord Hoffman Printing*, 912 F.2d at 611 n.l.

However, this concern is not implicated in cases such as this, in which the court already has jurisdiction over Rocket's federal claims and Noble's federal defenses. Including the petitions to confirm and vacate within the scope of the court's existing jurisdiction does not significantly expand that jurisdiction. Indeed, doing so expands it no further than the doctrine of supplemental jurisdiction allows. See 28 U.S.C. § 1367(a)(1) (issues

must form "same case or controversy"). Accordingly, I conclude that supplemental jurisdiction constitutes an "independent basis of jurisdiction" under the FAA. Because the prerequisites for supplemental jurisdiction have been met in this case, *see Carnegie–Mellon*, 484 U.S. at 349, 108 S.Ct. at 618, this court has subject matter jurisdiction to consider the parties' respective FAA petitions.

### III.

■ Absent a basis for modification or vacatur, a district court must confirm an arbitration award. *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir.1987). "The showing required to avoid summary confirmation of an arbitration award is high ... and a party moving to vacate the award has the burden of proof...." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997) (quotation and citations omitted). The purpose behind this limited scope of review is "to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir.1993).

Noble's opposition to confirmation and its cross-petition to vacate the arbitration award rest on the same three grounds. First, Noble contends that the award is not "final" under § 10(a)(4) of the FAA because the parties expressly reserved the defense of patent invalidity for future litigation. (Def. Mem. at 6–11; Def. Reply at 11–12) Second, Noble contends that the arbitration panel exceeded the scope of its authority under § 10(a)(4) of the FAA by requiring Noble to bear the full cost of the arbitrators' compensation and administrative fees. (Def. Mem. at 2–5; Def. Reply 2–10) Finally, Noble contends that the panel engaged in "manifest disregard of the law" by refusing to require Eslinger to testify about Rocket's alleged waiver and by not mentioning the issue of waiver in the award. (Def. Mem at 12–13; Def. Reply at 13)

#### A. *The Arbitration Award Is Final*

Section 10(a) (4) of the FAA provides, in relevant part, that a district court may vacate an arbitration award "[w]here the arbitrators [have] so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter submitted was not made." Noble contends that, because the parties entered into a stipulation expressly preserving Noble's patent invalidity defense for future litigation, the arbitration award cannot be considered "final." (Def. Mem. at 7)

As a preliminary matter, this claim, even if proved, does not set forth a basis for vacating the arbitration award under § 10(a)(4). Vacatur of an arbitration award for lack of finality is proper only where the arbitrators have "imperfectly executed" their powers. 9 U.S.C. § 10(a)(4); *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411, 414 (2d Cir. 1980). In this case, it can hardly be said that the arbitrators "imperfectly executed" their powers where the parties expressly took the issue of patent invalidity off the table.

Nevertheless, although a district court may not vacate an award for lack of finality in the absence of arbitrator error, courts have construed the FAA to prohibit a district court from confirming an arbitration award that is interlocutory and therefore not final. *Id.* The Second Circuit has stated the test for determining finality in various ways. In *Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc.*, 931 F.2d 191, 195 (2d Cir.1991), the Court recognized the "general rule that an arbitral determination is not final unless it conclusively decides every point required by and included in the submission of the parties." *See also A/S Siljestad v. Hideca Trading. Inc.*, 678 F.2d 391, 392 (2d Cir.1982). Under this standard, it would appear that the arbitration award in this case is final. As addressed more fully below, the award decided every point submitted by the parties in their stipulation. The award itself states that it is "in full settlement of all claims submitted to this Arbitration." (Def. Mem. Ex. 16 ¶ 8)

However, in a more recent case, *ConnTech Dev. Co. v. Univ. of Connecticut Educ. Props., Inc.*, 102 F.3d 677 (2d Cir.1996), the Court stated that "[a]n award is mutual, definite and final if it 'resolve[s] all issues submitted to arbitration, and determine[s] each

issue fully so that no further litigation is necessary to finalize the obligations of the parties.'" *Id.* at 686 (quoting *Dighello v. Busconi,* 673 F.Supp. 85, 90 (D.Conn.1987), *aff'd,* 849 F.2d 1467 (2d Cir.1988)); *see also Metallgesellschaft A.G. v. M/V Capitan Constante,* 790 F.2d 280, 283 (2d Cir.1986) (arbitration award was final where it was "subject to neither abatement nor set-off"). Under this standard, Noble's argument has more merit, because Noble intends to litigate further its defense of patent invalidity in order to upset the arbitration award.

Fortunately, it is unnecessary to decide which standard controls in this case. Even under the more permissive standard set forth in *ConnTech,* Noble's argument fails because the defense of patent invalidity—if litigated and proved—would not disturb the arbitration award. Showing why it would not necessitates a brief review of patent invalidity in relation to license agreements.

The leading case is *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), where the Supreme Court overturned the doctrine of licensee estoppel, under which a person licensed to use a patent was not able to avoid paying royalties to his licensor on the ground that the patent was invalid. *Id.* at 671–73, 89 S.Ct. at 1911–12. *Lear* established that a licensee may assert patent invalidity as a defense to an action for unpaid royalties due under a license agreement. *See Int'l Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49, 56 (2d Cir.1979). The Court based this holding "on the desirability of encouraging licensees to challenge the validity of patents, to further the strong federal policy that only inventions which meet the rigorous requirements of patentability shall be withdrawn from the public domain." *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 264, 99 S.Ct. 1096, 1100, 59 L.Ed.2d 296 (1979).

The *Lear* Court held also that a licensee is not required to pay royalties during the period in which it is challenging the validity of the patent. *Lear,* 395 U.S. at 673, 89 S.Ct. at 1912; *see also Lemelson v. Synergistics Research Corp.,* 669 F.Supp. 642, 646 (S.D.N.Y. 1987). However, in applying *Lear,* courts have held that a licensee is required to pay

those royalties that accrue while the license agreement is in effect and before the licensee "takes an affirmative step that would prompt early adjudication of the validity of the patent.... " *Rite–Nail Packaging Corp. v. Berryfast, Inc.,* 706 F.2d 933, 936–37 (9th Cir. 1983) (quotations omitted); *Hull v. Brunswick Corp.,* 704 F.2d 1195, 1203–04 (10th Cir.1983); *American Sterilizer Co. v. Sybron Corp.,* 614 F.2d 890, 895–98 (3d Cir.), *cert. denied,* 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); *PPG Indus. v. Westwood Chem. Inc.,* 530 F.2d 700, 706–07 (6th Cir.), *cert. denied,* 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976); *Lemelson,* 669 F.Supp. at 646 (S.D.N.Y.1987).

The Second Circuit has not defined what constitutes "an affirmative step" sufficient to release a licensee from future royalty obligations. Other courts that have addressed this issue have made it clear that the licensee must do more than withhold royalties. *See Hull,* 704 F.2d at 1203–04; *PPG Indus. v. Westwood Chem. Inc.,* 530 F.2d at 706; *Schwarzkopf Dev. Corp. v. Ti–Coating, Inc.,* No. 83–9042, 1988 WL 31852, at *2 (S.D.N.Y. Mar. 28, 1988); *Lemelson,* 669 F.Supp. at 646. For example, the Tenth Circuit has held that "if licensees wish to preserve patent invalidity as a defense to litigation over unpaid royalties, the licensees must notify the licensors that they are suspending payments because they question the validity of the payments." *Hull,* 704 F.2d at 1203; *see also Berryfast,* 706 F.2d at 936–37 ("[t]he licensee must clearly notify the licensor that the licensee is challenging the patent's validity"); *American Sterilizer,* 614 F.2d at 897–98 (nothing in record indicated "that [plaintiff] coupled its non-payment of royalties with notice to [defendant] that the reason for non-payment was [plaintiff's] intent to challenge the validity" of the patent); *PPG Indus.,* 530 F.2d at 706 (non-payment plus additional affirmative step required). This notice requirement furthers the goal underlying the Supreme Court's decision in *Lear:* the early adjudication of patent invalidity. *See Lemelson,* 669 F.Supp. at 646–47. If licensees are prohibited from withholding royalties until after they have notified the licensor, they will

have an incentive to provide prompt notice. *See Hull,* 704 F.2d at 1203–04.

■ In view of these principles, Noble's claim of patent invalidity cannot serve as a defense to the arbitration award. This conclusion flows from two undisputed facts: (1) the arbitration award gives Rocket the right to recover only those royalties that accrued before the date Rocket terminated the license agreement; and (2) prior to the date of termination, Noble had provided no notice to Rocket that it was withholding royalties on the ground of patent invalidity. Thus, under *Lear* and its progeny, Noble is liable for all royalty payments that accrued while the License Agreement was in effect, regardless of whether Rocket's patents are eventually deemed invalid. If, prior to the termination of the License Agreement, Noble had concluded that the patents were invalid, it had an obligation under *Lear* to bring that fact to Rocket's attention. Because Noble did not do so, patent invalidity is no defense to the arbitration award. As Noble does not challenge the finality of that award on any other ground, the arbitration award is final and confirmable under the FAA.

### B. *The Arbitrators Did Not Exceed the Scope of Their Powers*

Noble's second ground for opposing confirmation and seeking vacatur is also based on § 10(a)(4) of the FAA, which provides, relevant part, that a district court must vacate an award if "the arbitrators exceeded their powers.... " Noble argues that the arbitrators exceeded their powers when they charged Noble the full cost of the arbitrators' compensation and the AAA's administrative fees.

■ "The scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement." *Abram Landau Real Estate v. Bevona,* 123 F.3d 69, 74 (2d Cir.1997) (quotations omitted). If the arbitration panel has clearly exceeded the scope of its authority, the award must be vacated. However, if the arbitration panel "is even arguably construing or applying the contract and acting within the scope of [its] authority," its decision should not be vacated. *United Paperworkers Int'l Union, AFL–CIO v.*

*Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). The party moving to vacate an award bears the burden of proving that the arbitration panel exceeded the scope of its authority. *Blue Tee Corp. v. Koehring Co.,* 999 F.2d 633, 636 (2d Cir. 1993).

Noble argues that, because the stipulation did not include any reference to arbitration expenses, the arbitration panel had no authority to award them. (Def. Mem. at 3) Further, Noble contends that, even if the panel otherwise had authority to award the expenses of arbitration, that authority was abrogated by the License Agreement, which provided that the parties would "each pay for their own costs of the arbitration." (*Id.* Ex. 5, Art. VIII, § 7)

■ Noble's first argument mischaracterizes the nature of the stipulation. The parties stipulated to six substantive issues for arbitration and did so in response to the arbitrator's questions about the substantive scope of the arbitration. (Def. Mem. Ex. 14) Accordingly, the stipulation did not address issues such as arbitrators' compensation and administrative fees. However, these expenses are assignable to one party or another under Rule 43 of the Commercial Rules of Arbitration of the AAA, rules to which the parties explicitly agreed in the License Agreement to be bound. (*Id.* Ex. 5, Art. VIII, § 7) *See* 1 Martin Domke, *Domke on Commercial Arbitration* § 43.02, at 539 (Rev. Ed.1997) (courts reluctant to disturb allocation of expenses where parties agree to be bound by rules of AAA). Under these circumstances, Noble's claim that the issue of arbitration expenses was not within the scope of the arbitration is unavailing.

■ Noble's second argument—that the License Agreement called for a sharing of arbitrators' compensation and administrative fees—essentially raises a question of contract interpretation. Noble embarks on a long discussion intended to show that the term "costs" as used in the phrase, "NOBLE and ROCKET shall each pay for their own costs of the arbitration," includes every cost of arbitration, including the arbitrators' com-

pensation and the AAA's administrative fees. (Def. Reply 5–10)

Contrary to the thrust of this argument, the question before me is not whether I concur in the arbitration panel's decision or even whether the panel committed serious error under the License Agreement. The question is whether the arbitration panel "even arguably" complied with the terms of the agreement. *Misco*, 484 U.S. at 38, 108 S.Ct. at 370. I conclude that it did. It is at least arguable that the phrase "their own costs" refers to those expenses that each party would incur separately during arbitration, such as attorney's fees or compensation for expert witnesses. Likewise, it is at least arguable that "their own costs" does *not* refer to expenses that the parties would incur together, such as compensation for arbitrators or administrative fees.

The court's recent decision in *In Matter of Soft Drink & Brewery Workers Union Local 812, Forest Glen Distrib., Inc.*, No. 95–8071, 1996 WL 346459 (S.D.N.Y. June 25, 1996) is not to the contrary. There, I held that the arbitrator improperly awarded attorney's fees to the plaintiff where the labor contract did not authorize such an award. *Id.* at *1. The contract in *Forest Glen* provided that "[t]he administrative costs of arbitration, including the arbitrator's fees and expenses, are to be shared equally by the [parties]. All other costs of arbitration shall be borne by the party who incurred such costs." *Id.* This contract language contemplated two distinct types of costs: administrative costs, which were to be shared, and "other costs of arbitration," which were to be paid separately. In no case could one party be required to pay the full amount of either type of cost. Based on this clear language, I determined that the arbitrator did not have the authority to require the defendant to pay the plaintiff's attorney's fees. *Id.*

The specific language at issue in *Forest Glen* stands in contrast to the general language in the License Agreement in this case. The License Agreement states only that the parties shall bear "their own costs of arbitration," without explaining what the term "costs" means or indicating whether there were some expenses that could not be as-

signed to one party. Contrary to Noble's argument (Def. Reply at 7–10), this potential ambiguity does not furnish grounds for vacating the arbitration award. Rather, it raises a question of contract interpretation that properly fell to the arbitrators. As discussed above, the arbitrators arguably resolved this question correctly. Accordingly, I find that the arbitrators did not exceed their powers in requiring Noble to bear the cost of their compensation and the administrative fees.

## C. The Arbitration Panel Did Not Engage in Manifest Disregard of the Law

 Noble's final argument for vacatur is based on the doctrine of "manifest disregard of the law." This judicially created doctrine permits a court to vacate an arbitration award if the arbitrators understood and ignored a clearly governing legal principle. *See Standard Microsystems*, 103 F.3d at 12; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986). Manifest disregard "means more than error or misunderstanding with respect to the law.... The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Bobker*, 808 F.2d at 933 (citations omitted). Accordingly, "the reach of the manifest disregard doctrine is severely limited." *Dirussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir.) (quotations omitted), *petition for cert. filed*, 66 U.S.L.W. 3355 (U.S. Nov. 3, 1997) (No. 97–773).

Noble argues that the arbitration panel manifestly disregarded the law by failing to consider a clearly governing legal principle: waiver. (Def. Mem. at 12–13) In their stipulation, the parties asked: "If Noble breached the License Agreement, was such breach waived by Rocket?" (Def. Mem. Ex. 14) Noble contends that the arbitration panel disregarded this issue in two respects: first, by refusing to allow its attorney, Lesh, to question Rocket's attorney, Eslinger, about their telephone conversation; and second, by failing to mention the issue of waiver in the arbitration award.

The first argument fails because the arbitrators did not commit any discernible—must less "obvious"—legal error in not requiring Eslinger to testify. Lesh himself testified extensively regarding the issue of waiver and his understanding of the telephone conversation he had with Eslinger. (Tr. at 104) The arbitrators also permitted Lesh to argue why he should be allowed to call Eslinger to testify (*id.* at 115–22) and denied his request only after recessing to discuss the matter. (*Id.* at 123–24) In denying the request, the arbitrators indicated that they understood the thrust of Lesh's argument and needed no further testimony on the issue.[6] Under these circumstances, it cannot be said that the arbitrators' manifestly disregarded the law or ignored an obvious legal principle in refusing to allow Eslinger to testify.

Noble's second argument—that the arbitrators manifestly disregarded the law by not addressing the issue of waiver in their award—also fails. Noble assumes that, because the parties submitted six substantive issues for arbitration, the arbitrators had an obligation to make six separate findings in their award. However, the six submitted issues were not independent of one another but were steps on the way to the larger question at arbitration, namely, whether Noble breached the License Agreement such that Rocket was entitled to an audit and royalties. Thus, a finding that Rocket had not waived Noble's breach was necessarily subsumed in the arbitrators' award. The arbitrators were not required to make explicit this implicit finding. *Standard Microsystems,* 103 F.3d at 12 (arbitrators are not required to provide an explanation for their decision).

\* \* \*

For the reasons stated above, Noble has failed to make the showing necessary to avoid summary confirmation of the arbitration award. Accordingly, Noble's cross-peti-

tion for vacatur is denied, and Rocket's petition for confirmation is granted.

SO ORDERED:

---

[6]. After the arbitrators had recessed to determine whether Eslinger should testify, the arbitration chairman stated: "What we have ruled, after hearing argument, [is] that we are not going to permit you to examine Mr. Eslinger unless there is some kind of rebuttal testimony.... We understand the issues in the case, the documents in the case, we read them all, we are familiar with them." (*Id.* at 124)